# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

C.R. BARD, INC.,

*Plaintiff-Appellant-Cross-Appellee,*

v.

ATRIUM MEDICAL CORPORATION,

*Defendant-Appellee-Cross-Appellant.*

Appeals from the United States District Court for the District of Arizona, Phoenix, No. 2:21-cv-00284-DGC

## C. R. BARD, INC.'S OPENING BRIEF
## PROVISIONALLY FILED UNDER SEAL

MATTHEW A. TRAUPMAN
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue
New York, NY 10010

STEVEN C. CHERNY
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA 021996

DEANNE E. MAYNARD
BRIAN R. MATSUI
SETH W. LLOYD
DIANA L. KIM
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel:  (202) 887-8784
BMatsui@mofo.com

*Counsel for C. R. Bard, Inc.*

NOVEMBER 29, 2023

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-appellant-cross-appellee C.R. Bard, Inc., by and through its undersigned counsel, hereby certifies that: C.R. Bard, Inc. is a wholly-owned subsidiary of Becton, Dickinson and Company, and no publicly held company owns more than 10% of Becton, Dickinson and Company's stock.


Dated: November 29, 2023                    s/ Brian R. Matsui
                                        _____
                                            Brian R. Matsui

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF CONTENTS....................................................................... ii

TABLE OF AUTHORITIES ................................................................v

JURISDICTIONAL STATEMENT ........................................................1

INTRODUCTION ...............................................................................2

STATEMENT OF ISSUES ...................................................................3

STATEMENT OF CASE .....................................................................4

    A.    Factual Background.........................................................................4

        1.    The '135 patent and Canadian patent .........................................4

        2.    BPV lawsuit against Atrium for patent infringement...............5

        3.    Settlement negotiations .................................................................6

        4.    Settlement and License Agreements ......................................11

            a.    "Parties"..........................................................................11

            b.    Dismissal of BPV's lawsuit against Atrium..................13

            c.    License to "Licensed Patents" ......................................13

            d.    "Term" ............................................................................14

            e.    Payments........................................................................14

        5.    Bard's Performance and Atrium's Breach..............................16

    B.    Procedural History.........................................................................18

        1.    Bard's claims and Atrium's counterclaims.............................18

        2.    Summary judgment for Bard on contract interpretation..........19

        3.    Judgment for Atrium on patent misuse and quantum meruit ......................................................................................21

SUMMARY OF ARGUMENT ..............................................................23

STANDARD OF REVIEW ................................................................26

ARGUMENT ..................................................................................26

I.    THE DISTRICT COURT ERRED IN RULING THAT THE
MINIMUM ROYALTY PAYMENTS WERE PATENT MISUSE............26

    A.    The Minimum Royalty Payments Were Not Patent Misuse ..............26

        1.    Kimble expressly permits parties to defer compensation
for pre-expiration use of a patent beyond the patent's
expiration date without implicating patent misuse ..................27

        2.    The district court's findings and undisputed evidence
demonstrate that the minimum royalty payments were
deferred compensation ............................................................30

            a.    The License Agreement expressly dictated that the
"per-use" royalties for U.S. sales of Licensed
Products ended when the '135 patent expired...............30

            b.    Extrinsic evidence demonstrates that the minimum
payments compensated for Atrium's past
infringement and pre-expiration iCast sales .................34

        3.    The district court's legal errors led it to wrongly
determine that the post-expiration minimum payments
constituted patent misuse .........................................................44

            a.    The district court improperly required Bard to
disprove patent misuse...................................................44

            b.    The district court also erred by requiring Bard to
produce a particular kind of evidence ...........................48

    B.    In The Alternative, The Minimum Royalty Payments Were Not
Patent Misuse Because The Canadian Patent Has Not Expired ........51

II.    THE DISTRICT COURT ERRED IN RULING THAT BARD
CANNOT RECOVER ON AN ALTERNATIVE CLAIM OF
QUANTUM MERUIT ................................................................54

A.     This Court Should At Least Remand For Bard To Press Its Quantum Meruit Claim For The Fair Value Of The Release And License Granted To Atrium .......................................................... 54

B.     The District Court Legally Erred In Rejecting Bard's Quantum Meruit Claim ................................................................................. 56

      1.     The district court erroneously conflated quantum meruit with promissory estoppel ......................................................... 57

      2.     The district court also erred in holding that quantum meruit is not available in cases involving patent misuse ......... 58

CONCLUSION ......................................................................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alvarado Orthopedic Rsch., LP v. Linvatec Corp.*,
No. 11-cv-246, 2013 WL 2351814 (S.D. Cal. May 24, 2013)..........................52

*Am. Fed. of Musicians of U.S. & Can. v. Paramount Pictures Co.*,
903 F.3d 968 (9th Cir. 2018) ..............................................................49

*Ares Trading S.A. v. Dyax Corp.*,
No. 19-02300, 2023 WL 2456437 (D. Del. Mar. 10, 2023).........................47, 52

*Automatic Radio Mfg. Co. v. Hazeltine Res.*,
339 U.S. 827 (1950)..............................................................28, 50, 51

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
670 F.3d 1171 (Fed. Cir. 2012) .......................................................4, 5

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
No. 03-0597-PHX-MHM, 2009 WL 886514
(D. Ariz. Mar. 31, 2009) ........................................ 4, 9, 10, 24, 39, 40, 41, 43, 49

*BPV v. Atrium*,
No. 2:10-cv-1694 (D. Ariz. 2010) ....................................................5, 46

*Bradley Corp. v. Lawler Mfg. Co., Inc.*,
No. 19-cv-1240, 2020 WL 7027875 (S.D. Ind. Nov. 30, 2020)........................48

*Brulotte v. Thys Co.*,
379 U.S. 29 (1964).............................................................27, 28, 34, 50, 51

*Cardinal of Adrian, Inc. v. Keystone Consol. Indus., Inc.*,
No. 76-cv-70866, 1977 WL 22705 (E.D. Mich. Mar. 11, 1977) .................52, 53

*Columbus Life Ins. Co. v. Wilmington Tr.*,
No. 20-cv-736, 2021 WL 1820614 (D. Del. May 6, 2021)...............................60

*Conceptual Eng'g Assocs., Inc. v. Aelectronic Bonding, Inc.*,
714 F. Supp. 1262 (D.R.I. 1989) ......................................................47

*DP Aviation v. Smiths Indus. Aerospace & Defense Sys. Ltd.*,
  268 F.3d 829 (9th Cir. 2001) ..............................................................................26

*Energy Partners, Ltd. v. Stone Energy Corp.*,
  No. 2402-N, 2006 WL 2947483 (Del. Ch. Oct. 11, 2006)..................................33

*FatPipe Networks India Ltd. v. Xroads Networks, Inc.*,
  No. 9-cv-186, 2015 WL 12778762 (D. Utah Sept. 22, 2015) ............................47

*GAF Corp. v. Eastman Kodak Co.*,
  519 F. Supp. 1203 (S.D.N.Y. 1981) ............................................................51, 52

*GFI, Inc. v. Franklin Corp.*,
  88 F. Supp. 2d 619 (N.D. Miss. 2000).................................................................48

*Grunstein v. Silva*,
  No. 3932-VCN, 2011 WL 378782 (Del. Ch. Jan. 31, 2011).............................59

*Hearing Components, Inc. v. Shure, Inc.*,
  No. 7-cv-104, 2009 WL 815526 (E.D. Tex. Mar. 26, 2009)........................52, 53

*Kimble v. Marvel Enters., Inc.*,
  727 F.3d 856 (9th Cir. 2013) ................ 27, 28, 29, 33, 34, 53, 55, 56, 57, 58, 61

*Kimble v. Marvel Entertainment, LLC*,
  576 U.S. 446 (2015)............................................ 2, 27, 28, 29, 36, 41, 45, 46, 51

*Marta v. Nepa*,
  385 A.2d 727 (Del. 1978) ....................................................................................59

*McCullough Tool Co. v. Well Surveys, Inc.*,
  343 F.2d 381 (10th Cir. 1965) .............................................................................52

*Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*,
  900 F. Supp. 1386 (D. Colo. 1995)......................................................................47

*Nautilus, Inc. v. ICON Health & Fitness, Inc.*,
  304 F. Supp. 3d 552 (W.D. Tex. 2018) ...............................................................52

*Nepa v. Marta*,
  415 A.2d 470 (Del. 1980) ....................................................................................54

*Novo Industri A/S v. Travenol Lab'ys, Inc.*,
677 F.2d 1202 (7th Cir. 1982) ...............................................29

*Novo Nordisk A/S v. Caraco Pharm. Lab'ys., Ltd.*,
601 F.3d 1359 (Fed. Cir. 2010) ............................................47

*Ocean Tomo, LLC v. Barney*,
133 F. Supp. 3d 1107 (N.D. Ill. 2015) ..................................48

*OneBeacon Ins. Co. v. Haas Indus. Inc.*,
634 F.3d 1092 (9th Cir. 2011) ........................................26, 37

*Petrosky v. Peterson*,
859 A.2d 77 (Del. 2004) .........................................54, 55, 57

*Princo Corp. v. Int'l Trade Comm'n*,
616 F.3d 1318 (Fed. Cir. 2010) ............................................29

*Saint Lawrence Commc'ns LLC v. Motorola Mobility LLC*,
No. 15-cv-351, 2018 WL 915125 (E.D. Tex. Feb. 15, 2018) ...........................47

*Salamone v. Gorman*,
106 A.3d 354 (Del. 2014) ....................................................49

*Scheiber v. Dolby Lab'ys, Inc.*,
293 F.3d 1014 (7th Cir. 2002) .......................................55, 58, 61

*Stoltz Realty Co. v. Paul*,
No. 94C-02-208, 1995 WL 654152 (Del. Super. Sept. 20, 1995) ...............54, 58

*Sunrise Med. HHG, Inc. v. AirSep Corp.*,
95 F. Supp. 2d 348 (W.D. Penn. 2000) .............................52, 53

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
No. 4-cv-5312, 2008 U.S. Dist. LEXIS 4627
(N.D. Ill. Jan. 18, 2008) ........................................................48

*Trading Techs., Int'l v. IBG LLC*,
No. 10-cv-715, 2021 WL 25541 (N.D. Ill. Jan. 4, 2021) ...................47

*Transitron Elec. Corp. v. Hughes Aircraft Co.*,
487 F. Supp. 885 (D. Mass. 1980) .........................................48

*Tri-Tron Int'l v. Velto,*
    525 F.2d 432 (9th Cir. 1975) .............................................................26

*TSI Techs. LLC v. CFS Brands, LLC,*
    No. 23-cv-1011, 2023 WL 6294259 (D. Kan. Sept. 27, 2023) .........52

*Universal Elecs., Inc. v. Universal Remote Control, Inc.,*
    No. 12-cv-329, 2014 WL 12587050 (C.D. Cal. Dec. 16, 2015) ......47

*Walsh v. Schlecht,*
    429 U.S. 401 (1977).........................................................................29

*Well Surveys, Inc. v. Perfo-Log, Inc.,*
    396 F.2d 15 (10th Cir. 1968) ...........................................................53

*Wilmington Sav. Fund Soc'y, FSB v. PHL Variable Ins. Co.,*
    No. 13-cv-499, 2014 WL 1389974 (D. Del. Apr. 9, 2014) ..............60

*Windsor I, LLC v. CWCapital Asset Mgmt LLC,*
    238 A.3d 863 (Del. 2020) ................................................................57

*Zila, Inc. v. Tinnell,*
    502 F.3d 1014 (9th Cir. 2007) ....................................30, 32, 34, 51

**Statutes**

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1332 ....................................................................................1

**Other Authorities**

Fed. R. App. P. 4(a)(1)(A) .....................................................................1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered summary judgment for C.R. Bard, Inc. ("Bard") on Atrium Medical Corporation's counterclaims on March 23, 2023 (1-ER-21-41) and final judgment for Atrium on Bard's remaining claims on June 30, 2023 (1-ER-2-20). Bard timely appealed on July 20, 2023. *See* Fed. R. App. P. 4(a)(1)(A). Atrium cross-appealed on July 28, 2023.

**INTRODUCTION**

In *Kimble v. Marvel Entertainment, LLC,* the Supreme Court declined to overrule the rule prohibiting patent owners from collecting royalties for use of a patent after it expires. 576 U.S. 446 (2015). But in doing so, the Court made clear that what little remained of the rule should not be expanded. It expressly approved many ways to contract around the rule, such that post-expiration payments cannot be assumed to be impermissible royalties for post-expiration use. Patent misuse instead requires proof that the payments compensate the patent owner for use of an expired patent. And it requires the party asserting patent misuse to produce evidence showing this impermissible purpose. Mere silence or ambiguity in the agreement does not suffice. Anything less would violate this Court's admonition that the rule not be expanded.

The district court flipped these basic principles on their head. It took an agreement that required Atrium to make fixed minimum royalty payments until the last of the two patents expired and assumed those payments, after the first patent expired, compensated Bard for use of the expired patent. That was legal error. Atrium—the party trying to break the deal—had to prove patent misuse. But the district court faulted Bard for not proving the negative: that the post-expiration payments did not compensate Bard for post-expiration use. In essence, the district

court did what the Supreme Court and this Court admonish against—it expanded patent misuse by creating a default rule that post-expiration royalties are misuse.

Absent the district court's backwards reasoning, it could not have concluded that the post-expiration minimum payments here were patent misuse. Nothing in the agreement stated the minimum payments compensate Bard for use of an expired patent. Nor did Atrium present any evidence that the payments were for post-expiration use. To the contrary, the district court's own findings and the undisputed evidence showed that those post-expiration payments compensated Bard for other things—including massive infringement damages that Atrium would have owed Bard absent the settlement agreement. Under *Kimble*, that is not patent misuse.

The judgment should be reversed.

## STATEMENT OF ISSUES

1.     Whether the district court erred in concluding that the License Agreement's requirement that Atrium pay an annual minimum of $15 million until expiration of the last patent covered by the Agreement was patent misuse.

2.     If the License Agreement is unenforceable due to patent misuse, whether the district court erred in denying Bard quantum meruit recovery.

# STATEMENT OF CASE

## A.    Factual Background[1]

### 1.    *The '135 patent and Canadian patent*

Bard is a medical device company, and Bard Peripheral Vascular, Inc. ("BPV") is a wholly-owned subsidiary of Bard. 1-ER-2. BPV owns two patents for groundbreaking technology that used expanded polytetrafluoroethylene ("ePTFE") to enable the creation of the first commercially viable vascular grafts. 1-ER-2; *see Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, No. 03-0597-PHX-MHM, 2009 WL 886514, at *9 (D. Ariz. Mar. 31, 2009) (describing the patented invention as "an important industry achievement, which, some 30 years later, still remains the gold standard for vascular grafts"). The first patent, U.S. Patent 6,435,135 ("'135 patent"), was issued in 2002 and expired on August 20, 2019. 1-ER-2; 2-ER-51-64. The second patent, Canadian Patent 1,341,519 ("Canadian patent"), relies on the '135 patent for priority and expires on January 2, 2024. 1-ER-2; 3-ER-271.

In 2003, BPV sued W.L. Gore & Associates, Inc. ("Gore") for infringement of the '135 patent. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1177 (Fed. Cir. 2012), *vacated in part on reh'g en banc*, 476

---

[1] The Statement includes background relevant to both Bard's appeal of the district court's final judgment on patent misuse and Atrium's cross-appeal of its summary judgment decision interpreting the agreements.

F. App'x 747 (Fed. Cir. 2012). After trial, the jury found that the patent was valid and that Gore willfully infringed it. *Id.* The jury awarded Bard reasonable royalties for past infringement and lost profits, and the court added enhanced damages and attorneys' fees. *Id.* at 1178. The final judgment, including prejudgment interest and attorneys' fees, totaled $519 million. 2-ER-157; 5-ER-650. The court also ordered Gore to pay forward-looking royalties of 12.5% to 20% on various products. 2-ER-160-61. *See Gore*, 670 F.3d at 1193 (affirming, as relevant here, that judgment).

### 2.   *BPV lawsuit against Atrium for patent infringement*

Following the successful judgment against Gore in 2009, BPV sued Atrium for patent infringement in 2010. 1-ER-2; *BPV v. Atrium*, No. 2:10-cv-1694 (D. Ariz. 2010). Like Gore, Atrium sold various ePTFE products that used BPV's intellectual property. 1-ER-5; 1-ER-28. One category ("Vascular Products") consisted of grafts and stents using ePTFE that were approved for vascular uses by the Food and Drug Administration ("FDA"). 1-ER-5. Vascular Products constituted about 11% of Atrium's U.S. sales of ePTFE products in 2010 (1-ER-5), and Atrium had sold around $140 million of such products worldwide by 2011 (5-ER-647; 5-ER-731).[2]

In addition to Vascular Products, Atrium also sold in the United States an ePTFE-covered stent called iCast. 1-ER-5. iCast sales accounted for most of

---

[2] Atrium manufactured all Vascular Products in the United States, so all sales of Vascular Products infringed the '135 patent regardless of where they were sold. 3-ER-310.

Atrium's U.S. sales of ePTFE products (nearly 90%) in 2010 (1-ER-5), and Atrium had sold over $180 million in iCast by 2011 (5-ER-651; 5-ER-731). At the time, iCast had FDA approval for tracheobronchial use but not yet for vascular use. 1-ER-5. Atrium knew, however, that the vast majority (99%) of its iCast sales were purchased for off-label vascular use (1-ER-5)—meaning that, although iCast was not FDA approved (and thus not labeled) for such use, that was how it was being used virtually all the time (3-ER-308).

As the owner of the '135 patent, BPV filed the infringement suit against Atrium. 2-ER-99-101. Bard was not a party.

### 3. Settlement negotiations

Both parties had strong incentives to settle. 1-ER-6. From Atrium's perspective, the sizable judgment against Gore for selling similar products underscored Atrium's substantial risk of liability. 1-ER-6. Atrium was seeking to be acquired, and a pending lawsuit was a "big issue" that would discourage buyers. 2-ER-92-93; 1-ER-6-7. From BPV's perspective, it did not want to relitigate validity questions that might jeopardize its judgment against Gore and ongoing royalties for Gore's continued sales of infringing products. 1-ER-6.

Settlement negotiations began shortly after the complaint was filed. 1-ER-7. BPV president Jim Beasley contacted Atrium CEO Steve Herweck and asked Atrium to direct all negotiations to Charles Krauss, counsel for Bard. 5-ER-729; 2-

6

ER-112-13; 2-ER-80; 2-ER-210.  The lead negotiators were Bill Scofield for Atrium and Krauss for Bard.  1-ER-7.  Although Bard handled the negotiations, all involved, including Scofield, understood that the purpose of the negotiations was to settle the lawsuit filed by BPV and grant Atrium a license.  2-ER-128-29; 1-ER-28.

During initial negotiations, both parties assumed a "per-use" royalty structure in which Atrium would pay a royalty on each sale of a covered product.  1-ER-10-11.  That "per-use" structure was modeled after the royalties ordered against Gore.  1-ER-11; 5-ER-657 ("This proposal attempts to track the overall structure of the Bard/Gore case.").  For example, Bard's opening offer on November 24, 2010, would have required Atrium to pay royalties of 10% on all sales from 2002 to 2007, then 15% on all sales from 2007 to 2019.  1-ER-10; 5-ER-659.  Bard's offer made clear that these royalties would include both Vascular Products and iCast and that royalties would end when the '135 patent expired in 2019.  1-ER-10-11; 5-ER-659.

This "per-use" model was Bard's preferred structure, and inclusion of iCast was crucial to Bard because iCast was the vast majority of Atrium's U.S. business.  1-ER-11.  Atrium's December 2, 2010, counteroffer followed the same "per-use" royalty structure and included iCast sales, but it proposed different royalty rates.  1-ER-11; 5-ER-660.  Krauss was pleased about the general agreement on structure and believed the parties were close to settlement.  1-ER-11.

Four days later, however, Atrium reversed itself, stating it would not pay royalties on iCast sales. 1-ER-11. Atrium contended that iCast did not infringe the '135 patent because iCast had FDA approval only for tracheobronchial use, not vascular use. 1-ER-11. Bard rejected Atrium's new position. BPV had already prevailed on this very issue against Gore. 1-ER-11; 3-ER-452-55. Like Atrium's iCast, Gore's Viabahn stent was approved only for tracheobronchial use during the first several years of the damages period, but BPV was awarded damages for *all* sales of Viabahn. 2-ER-160-61; 3-ER-452; 5-ER-770. Moreover, Atrium conceded it knew that most iCast sales were for off-label vascular use. 1-ER-5; 5-ER-699.

Because Atrium's change in position was so significant, Bard questioned whether Atrium was serious about settling. 1-ER-12; 5-ER-682. As Krauss explained, there was "no way" Bard would accept a settlement that did not cover iCast. 1-ER-11; 3-ER-463. But Atrium assured Bard that it remained serious about settling. 1-ER-12; 5-ER-682. Atrium explained that it was seeking FDA approval for vascular use of iCast and was concerned that paying "per-use" royalties for off-label sales would jeopardize its chances of obtaining approval. 1-ER-12; 5-ER-682. Atrium worried such royalties might lead the FDA to believe it was illegally selling iCast for off-label use. 1-ER-12; 5-ER-682. Because Atrium projected iCast sales would increase significantly once it obtained FDA approval (2-ER-95-96; 2-ER-

123; 5-ER-680), Atrium told Bard "it would not be in either of our interests to jeopardize Atrium's ability to complete the FDA approval process." 5-ER-682.

To address both parties' concerns, Bard and Atrium reached a compromise—a settlement structure that accommodated Atrium's need to avoid explicitly tying royalties to iCast sales (including for off-label use) while still approximating some of what Bard would have received under the *Gore* case model. 1-ER-14; 3-ER-476-77. This new structure involved (a) no express compensation for any past infringement by either iCast or Vascular Products, and (b) no express royalties on future sales of iCast as long as it did not have FDA approval for vascular applications.

Instead, Atrium would pay a 15% royalty solely for future sales of Vascular Products, but if those Vascular Product royalties came to less than $15 million in a given year, Atrium would make a minimum payment of $15 million. 1-ER-13. If iCast received vascular FDA approval, the $15-million minimum payments would cease and, going forward, Atrium would instead pay the same 15% royalty for iCast sales as for Vascular Products sales. 1-ER-13. Atrium told Bard it expected to receive FDA approval—and thus start paying iCast royalties—within one or two years. 1-ER-8. Atrium expected that, after FDA approval, the 15% royalty on iCast would exceed $15 million per year. 2-ER-95-96; 2-ER-123.

Thus, the $15-million minimum payments were intended to replace the *Gore* model's direct compensation for (a) all past infringement and (b) future iCast sales until and unless iCast was approved by the FDA for vascular use. Of course, an exact calculation of what that compensation would have been under the *Gore* model was impossible because it depended on uncertain future events, such as when FDA approval would occur and how well iCast would sell. 1-ER-14; 3-ER-476-77. The minimum payments were thus an approximate replacement for what Bard had given up for past liability and would give up on iCast. Bard agreed to this compromise because it was "the closest thing we could come to as a proxy for some type of rough valuation" without risking litigation that might jeopardize the *Gore* judgment. 1-ER-14; 3-ER-476-77.

The parties agreed to the above terms on January 20, 2011 (1-ER-14), and the remaining details were ironed out during a back-and-forth drafting process (2-ER-131; 5-ER-663). The first draft included a standard term that the agreement would continue until the last of the patents covered by the agreement expired. 1-ER-14. Atrium asked Bard to confirm which patents were covered, and Bard named the '135 patent and the Canadian patent. 5-ER-661; 1-ER-29. Atrium agreed. 1-ER-14. Indeed, Scofield explained that Atrium "[a]bsolutely" understood the agreement to cover both the '135 patent and the Canadian patent. 2-ER-117.

### 4.	*Settlement and License Agreements*

Atrium and Bard signed the resulting Settlement Agreement and License Agreement in March 2011.  1-ER-7.  The Settlement and License Agreements were drafted and executed together and, by their terms, were intended to be interpreted together.  *See* 2-ER-144 (License Agreement, "together with the Settlement and Release Agreement," "constitutes the entire understanding and agreement between the parties"); 2-ER-151 (License Agreement was entered "[i]n consideration of" the Settlement Agreement).  The Settlement Agreement stated that, because the parties' agreement was "achieved after thorough bargaining and negotiations with attorneys advising each Party," any dispute over its interpretation "shall not be resolved by any rule of interpretation providing for interpretation against the Party who caused the uncertainty to exist or against the draftsman."  2-ER-153.

#### a.	"Parties"

The Settlement and License Agreements defined the "Parties" the same way.  2-ER-133; 2-ER-151.  The License Agreement called them "Licensor" and "Licensee."  2-ER-133.  The "Licensor" was defined as "C.R. Bard, Inc., a New Jersey corporation, with an address at 730 Central Avenue, Murray Hill, NJ 07974 ('Bard')."  2-ER-133; 2-ER-151.  The "Licensee" was defined as "Atrium Medical Corporation, a Delaware corporation, having a principal place of business at 5 Wentworth Drive, Hudson, NH 03051 ('Atrium')."  2-ER-133; 2-ER-151.

Although the definition of "Licensor" did not specifically name BPV, the Agreements made sense only if "C.R. Bard, Inc." included its subsidiary BPV.[3]  For example, the Agreements repeatedly referred to "Bard" or "Licensor" as the plaintiff in the pending lawsuit against Atrium:

- "Bard and Atrium are in dispute (the '<u>Dispute</u>') with respect to certain matters relating to U.S. Patent No. 6,436,135 (the '<u>Patent</u>'), which Dispute is described in that certain Complaint for Patent Infringement filed with the U.S. District Court for the District of Arizona (the '<u>Court</u>'), Case No. 2:10-cv-01694-DGC," 2-ER-151;

- "Atrium and Bard desire to fully and finally resolve and settle any and all issues related to the Dispute," 2-ER-151;

- "Bard shall . . . take such action, including filing such documents, as required by the Court in order to dismiss the Complaint without prejudice," 2-ER-152;

- In the context of termination, the License Agreement referred to "all claims of the Patent then outstanding that were asserted by Licensor against Licensee in that certain Complaint for Patent Infringement filed with U.S. District Court for the District of Arizona, Case No. 2:10-cv-01694-DGC," 2-ER-142.

The License Agreement also stated: "Licensor is the owner of U.S. Patent No. 6,436,135 (the '<u>Patent</u>')."  2-ER-133.

---

[3] Consistent with this interpretation, contemporaneous statements from both Bard and Atrium used "Bard" or "C.R. Bard" interchangeably to refer to both Bard the parent and BPV the subsidiary.  *See, e.g.*, 5-ER-723-27; 5-ER-703-04, 5-ER-712, 5-ER-714.

### b. Dismissal of BPV's lawsuit against Atrium

The Settlement Agreement required "Bard"—that is, BPV—to dismiss its lawsuit against Atrium. 2-ER-152. It also released Atrium, "[i]n consideration of Atrium's execution of the License Agreement," from claims "arising out of or related to the Dispute." 2-ER-151. The release was "conditioned upon compliance by Atrium with all of the provisions of the License Agreement; provided, however, that if Atrium has complied with all of the provisions of the License Agreement from the Effective Date through January 1, 2015 (the "Compliance Date") . . . , then upon the Compliance Date, the foregoing release shall become unconditional and irrevocable." 2-ER-151-52.

### c. License to "Licensed Patents"

The License Agreement granted Atrium a license "under the Licensed Patents" and the right to make and sell "Licensed Products" during "the life of such Licensed Patents." 2-ER-136.

"Licensed Patents" were defined as the '135 patent (abbreviated "the Patent") and "all other patents of Licensor issued anywhere in the world that rely on the Patent for priority." 2-ER-133, 2-ER-136. As the Canadian Patent relies on the '135 patent for priority, the parties confirmed during drafting that "Licensed Patents" encompassed both the '135 patent and the Canadian patent. 5-ER-661; 1-ER-29.

"Licensed Products" included, as relevant here, "(i) the products of Licensee incorporating [ePTFE] in existence as of the Effective Date, as set forth on Exhibit A," and "(ii) upon Licensee's receipt of approval from the FDA to market and sell such products with a vascular indication, the Non-Vascular Products." 2-ER-134. Subsection (i) referred to Atrium's Vascular Products, while subsection (ii) referred to iCast (the only "Non-Vascular Product"). 2-ER-148-49. Under subsection (ii), iCast was not a Licensed Product unless and until it received FDA approval for vascular use. Additionally, all Licensed Products were geographically limited to only those "made, used, offered for sale and/or imported or sold in a country where one or more claims of the Licensed Patents are issued and outstanding." 2-ER-134-35.

### d. "Term"

The License Agreement's "Term" provision stated the Agreement "shall remain in full force and effect until the last to expire of all of the patents included within the Licensed Patents." 2-ER-142. The Canadian Patent is the last Licensed Patent to expire and does so on January 2, 2024. 3-ER-271; 1-ER-22-23.

### e. Payments

Payment was governed by two different subsections of the License Agreement. First, Section 3.1 required Atrium to pay "a royalty of fifteen percent (15%) of the Net Sales of all Licensed Products sold during the Term." 2-ER-136.

As noted, iCast sales were excluded until iCast was approved by the FDA for vascular use. Until then, Atrium would pay royalties only on Vascular Products.

Additionally, because Licensed Products included only products sold "in a country where one or more claims of the Licensed Patents are issued and outstanding" (2-ER-134-35), royalties under Section 3.1 were temporally limited by the Licensed Patents' expiration. Thus, Atrium was required to pay a 15% royalty on U.S. sales until the '135 patent expired. 1-ER-7. When the '135 patent expired in 2019, Atrium's obligation to pay royalties on U.S. sales would cease. 1-ER-7. Atrium would, however, continue to owe royalties on Canadian sales until the Canadian patent expired in 2024. 1-ER-7.

Second, Section 3.2 provided: "Notwithstanding anything to the contrary set forth in Section 3.1, in no event will royalties for any calendar quarter of the Term be less than [$3,750,000]" (*i.e.*, $15 million per year). 2-ER-137. Although Section 3.2 was titled "Minimum Royalties" (2-ER-133), the payments governed by this provision did not function like a royalty, unlike Section 3.1. Atrium would still have had to make the minimum payment even if it sold no Licensed Products.

Rather, the minimum payment provision worked as follows: First, each quarter, Atrium would calculate the amount of royalties owed under Section 3.1 in a "Royalty Statement" and "pay to Licensor all such amounts." 2-ER-137. Then, if "the royalty amount set forth in any Royalty Statement is less than the minimum

royalties specified in <u>Section 3.2</u>," Atrium would pay "such amount as is required to satisfy [its] minimum royalty obligation." 2-ER-137. In other words, each payment first included any royalties owed under Section 3.1, and then Section 3.2 made up the difference between that amount and the minimum. 1-ER-8.

Section 3.2 provided two ways in which Atrium's minimum payment obligation could terminate before the Agreement's Term. First, if Atrium obtained FDA approval for vascular use of iCast. 2-ER-137. In that event, iCast would become a Licensed Product, and Atrium would pay a 15% royalty on iCast in accordance with Section 3.1. 2-ER-137.

Second, Atrium's minimum payment obligation would terminate if the FDA rescinded all approval for iCast, including for tracheobronchial use. 2-ER-137. This protected Atrium from paying the $15-million minimum if it could not sell iCast at all. 1-ER-9. If neither condition occurred, minimum payments would continue for the Term of the License Agreement—*i.e.*, until the Canadian patent expired in 2024. 2-ER-142; 1-ER-9.

### 5. *Bard's Performance and Atrium's Breach*

Pursuant to the Settlement Agreement, BPV dismissed its lawsuit against Atrium on March 30, 2011. 1-ER-7. Thereafter, Atrium continued to sell Vascular Products and iCast pursuant to its license under the License Agreement, and BPV has not since sued Atrium for infringement. 2-ER-86-87; 1-ER-29. From 2011 to

2019, Atrium generated over $1 billion in sales of Vascular Products and iCast. 5-ER-731.

Despite Atrium's representation that it would obtain FDA approval for vascular use of iCast within one or two years, it did not obtain approval within the eight years before the '135 patent expired. 2-ER-74. Atrium has thus never paid royalties for iCast sales under Section 3.1. Because royalties on Vascular Products under Section 3.1 never exceeded $15 million, Atrium has owed only the minimum royalty payment under Section 3.2 every year. Atrium made those payments for eight years without objection until 2019. 2-ER-184; 1-ER-29.

All that changed when the '135 patent expired in 2019. Atrium then stopped making minimum payments required by the License Agreement. 2-ER-184; 1-ER-29. It continued to pay royalties under Section 3.1 for Canadian sales that used the Canadian Patent—at least initially. 2-ER-178-79, 2-ER-184-86, 2-ER-188. After Bard filed this lawsuit, Atrium stopped paying those royalties too. 2-ER-178-79, 2-ER-184-86, 2-ER-188.

Atrium finally obtained FDA approval for vascular use of iCast on March 22, 2023, a decade later than it had represented in negotiations. 3-ER-322; 2-ER-46. Atrium's obligation to make minimum payments under Section 3.2 thus terminated on that date. Had Atrium complied with the License Agreement by making those minimum payments until March 2023, it should have paid Bard in total around $183

million (*i.e.,* 12 ¼ years at $15 million per year). That is tens of millions of dollars less than what it would have paid under a "per-use" royalty model, according to calculations from Bard's expert below. 5-ER-656; 5-ER-731. Despite having already received a good deal on the license as a result of Bard's compromise, Atrium has tried to retroactively extract more and has refused to pay three-and-a-half years' worth of minimum payments due under the Agreements, amounting to $52,791,945. 5-ER-820.

## B. Procedural History

### 1. *Bard's claims and Atrium's counterclaims*

After Atrium stopping making minimum payments, Bard sued for breach of contract. 2-ER-236-52. Bard alleged Section 3.2 required Atrium to pay a $15-million annual minimum payment until either Atrium obtained FDA approval for vascular use of iCast or the License Agreement ended with the Canadian Patent's expiration in 2024, whichever came first. 2-ER-239. In the alternative, Bard sought either quantum meruit recovery for the fair value of the release and license or enforcement under promissory estoppel of Atrium's promise to pay. 2-ER-249-50.

Atrium asserted counterclaims against Bard for breach of contract, unjust enrichment, fraudulent inducement, and negligent misrepresentation. 2-ER-217-35. Atrium's counterclaims were based on an allegation that the Settlement and License Agreements had named the wrong party. Atrium claimed that only Bard, not BPV,

was a party to the Agreements.  2-ER-222.  It argued that, because BPV owned the '135 and Canadian patents, Bard never provided Atrium a license as required by the License Agreement.  2-ER-225-26.  According to Atrium, this required Bard to refund all payments previously made.  2-ER-230.  Such an argument, if accepted, would essentially have allowed Atrium to practice the patents for free.

## 2. *Summary judgment for Bard on contract interpretation*

On summary judgment, the district court correctly recognized that Atrium's interpretation of the contract would lead to an "absurd result."  1-ER-30.  The court agreed with Bard that BPV was a party to the Agreements because the term "C.R. Bard, Inc." included its wholly-owned subsidiary BPV.  2-ER-199-202; 1-ER-25-33.[4]

The court concluded the Agreements' text was ambiguous.  1-ER-26.  On one hand, they defined "Licensor" as only "C.R. Bard, Inc." and did not name BPV or require a signature from BPV.  1-ER-26.  On the other, they used "Bard" and "Licensor" to refer to the plaintiff of the pending lawsuit, which was only BPV.  1-ER-26-27.

---

[4] Although Bard mistakenly asserted in response to Atrium's motion to dismiss that Bard was the sole Licensor, Bard corrected that error in its summary judgment briefing, contending that "C.R. Bard, Inc." included BPV.  2-ER-199-202. The district court held Bard was not estopped from arguing that "C.R. Bard, Inc." included BPV.  1-ER-33-34.

The court thus turned to extrinsic evidence and concluded that the undisputed evidence resolved the ambiguity and confirmed Bard's interpretation. 1-ER-27-29. The court noted the Agreements' purpose was to settle the lawsuit filed by BPV and to grant Atrium a license to the '135 and Canadian patents—neither of which was possible without BPV. 1-ER-28-29. The court rejected Atrium's "absurd" interpretation that it had agreed to pay millions of dollars to an entity that was not even a party to the lawsuit Atrium was trying to settle. 1-ER-30. The court thus held that the only conclusion a reasonable person could reach is that BPV was a party. 1-ER-29.[5]

Because it held BPV was a party to the Agreements, the court granted summary judgment for Bard on all of Atrium's counterclaims. 1-ER-40-41. It noted that Atrium had received exactly what it had bargained for: BPV had dismissed its lawsuit against Atrium, and Atrium had sold its products without being sued for infringement. 1-ER-28-29; 1-ER-41.

The court also granted partial summary judgment for Bard on its contract claim, holding the License Agreement required minimum payments until 2024 or

---

[5] The court also recognized it "might be able to resolve this case another way." 1-ER-32 n.6. Bard argued, in the alternative, that it controlled BPV as a wholly-owned subsidiary and thus was able to grant a license to patents owned by BPV even if BPV was not a party to the Agreements. 2-ER-203-05. Although acknowledging this possibility, the court concluded it need not rely on this alternative argument because BPV was itself a party to the Agreements. 1-ER-32 n.6.

until iCast was approved for vascular use, whichever was earlier.  1-ER-40.  The court explained that, because BPV was included in the definition of "Licensor," the Canadian Patent was a "patent of Licensor" and thus a "Licensed Patent."  1-ER-35. Absent approval for iCast, Atrium's minimum payment obligation therefore continued until the Canadian patent expired in 2024.  1-ER-40.

The court did not grant judgment for Bard, however, because it concluded Atrium's patent misuse defense warranted a trial.  Atrium argued that any minimum payments sought after 2019 were an improper attempt to extract royalties under the '135 patent after it had expired.  2-ER-214-16.  Bard countered that minimum payments after 2019 were not royalties for ongoing post-expiration U.S. sales.  2-ER-205-07.  Instead, they compensated for (1) past infringement that had occurred before the settlement, and (2) pre-expiration iCast sales.  2-ER-205-07.  The court concluded that the Agreements were ambiguous as to the purpose of the minimum payments and factual disputes prevented summary judgment.  1-ER-37-40.

### 3.    *Judgment for Atrium on patent misuse and quantum meruit*

After holding a bench trial, the district court ruled for Atrium on its patent misuse defense.  The court agreed with Bard that, under Section 3.1 and 3.2, the minimum payments did not include ongoing royalties for U.S. sales of Licensed Products after the '135 patent's expiration.  1-ER-17.  It also agreed that minimum

payments included compensation for past infringement and for iCast sales. 1-ER-17-21. It disagreed with Bard, however, on two fronts.

First, in a single sentence, the court held that part of the minimum payments was compensation for infringement that occurred before the settlement, but it held that such compensation was fully paid—and thus ceased to be part of the minimum payments—in 2015 when the Settlement Agreement made Atrium's release from past liability irrevocable. 1-ER-17.

Second, it held that the minimum payments were intended to compensate not just for iCast sales until expiration of the '135 patent, but also for ongoing iCast sales after expiration. 1-ER-17. The court identified no evidence that the parties had agreed that the minimum payments should cover post-expiration sales. 1-ER-17. Instead, it relied on the absence of contemporaneous statements proving the parties had discussed cutting off compensation for off-label iCast sales upon expiration. 1-ER-16-17.

The court noted that Atrium bore the burden of proving patent misuse, and it observed that courts were split over whether that burden required proof by clear and convincing evidence or a preponderance. 1-ER-16-17. Yet despite relying primarily on the absence of evidence, it deemed it unnecessary to decide the evidentiary standard because it believed Atrium had met its burden under either standard. 1-ER-16-17.

The court also rejected Bard's quantum meruit and promissory estoppel claims as barred by patent misuse.  1-ER-18-20.

## SUMMARY OF ARGUMENT

I.  The agreements at issue here required flat minimum royalty payments until the last of the two licensed patents expires.  Nothing in the agreements' text indicated that those payments, after the first patent expires, compensate for post-expiration use of the expired patent.  Nor did the parties' negotiations, based on the facts found by the district court and the undisputed evidence at trial.  Under *Kimble* and this Court's precedents, that is not patent misuse for two independent reasons.

A.  First, the Supreme Court made clear in *Kimble* that, when a patent expires, the patent misuse doctrine prohibits only one thing:  royalties for post-expiration use of the expired patent.  Absent proof that post-expiration payments serve this impermissible purpose, parties can structure licensing agreements as they please, including by deferring payments for pre-expiration use into the post-expiration period.  This means that patent misuse does not occur simply because payments continue after a patent expires or because an agreement is silent as to the payments' purpose.  Atrium had to prove that those payments actually compensate for post-expiration use.

Had the district court applied these principles, the only reasonable conclusion it could have reached is that the minimum payments were not for post-expiration use

of the '135 patent and thus were not patent misuse. The district court correctly found that the License Agreement terminated any "per-use" royalties on U.S. sales of Licensed Products when the '135 patent expired. It also correctly found that the License Agreement did not expressly state the purpose of the minimum payments. Thus, nothing in the agreements themselves suggested—let alone provided—that the payments extracted royalties for post-expiration use.

The district court also correctly found that the minimum payments were the product of a compromise during the settlement negotiations. Its factual findings establish the following: Following Bard's judgment against Gore, Bard wanted "per-use" royalties on past and future sales of all infringing products, including iCast, until the '135 patent expired. Because Atrium refused to pay direct royalties on iCast, Bard compromised and accepted the minimum payments as a replacement. Based on these findings, the district court correctly found that the minimum payments were a proxy for what Bard had given up under the *Gore* model—royalties for past infringement and iCast sales.

Where the district court erred, however, was when it applied these findings and undisputed facts to the requirements for patent misuse. Instead of requiring Atrium to prove that the minimum payments included compensation for post-expiration use, the district court required Bard to prove that they did not. Only by doing so could the court have assumed, without evidence, that the minimum

payments included compensation for post-expiration iCast sales. That contravened *Kimble*'s instruction that post-expiration payments are not presumptively patent misuse and this Court's instruction not to expand the patent misuse doctrine.

B. Second, *Kimble* made clear that no patent misuse occurs when a license for a package of patents requires royalties until the last patent in the package expires. Here, the License Agreement covered the '135 patent and the Canadian patent, so minimum payments were permitted to run until the Canadian patent expires in 2024. The district court failed to consider this alternative argument at all.

II. Even if there were patent misuse, the district court erred in denying Bard quantum meruit relief. If minimum payments are unenforceable after 2019, Bard has conveyed a valuable release and license to Atrium without receiving the full benefit of their bargain. This Court has stated that, in such circumstances, quantum meruit recovery is available if the fair value of the release and license is greater than the royalties Atrium has paid to date. Contrary to the district court's view, such recovery would not award Bard what it was promised under the contract but instead would put Bard back in the position it would have been in if the contract had never been entered.

The district court ignored this Court's instructions and declined to consider the fair value of what Atrium received. This Court should remand for the district court to evaluate that value in the first instance. Bard's expert demonstrated below

that the fair value of the release and license significantly exceeds the royalties Atrium has paid to date. To deny Bard quantum meruit relief after Bard fully performed its side of the bargain would allow Atrium to have its cake and eat it too.

## STANDARD OF REVIEW

While this Court reviews factual findings for clear error, it reviews de novo conclusions of law and mixed questions of law and fact. *OneBeacon Ins. Co. v. Haas Indus. Inc.*, 634 F.3d 1092, 1096 (9th Cir. 2011). "When a district court uses extrinsic evidence to interpret a contract, [this Court] review[s] the findings of fact for clear error and the principles of law applied to those facts de novo." *DP Aviation v. Smiths Indus. Aerospace & Defense Sys. Ltd.*, 268 F.3d 829, 836 (9th Cir. 2001). Although the district court labeled much of its decision "Findings of Fact" (1-ER-5-18), this Court "look[s] at a finding or a conclusion in its true light, regardless of the label that the district court may have placed on it." *Tri-Tron Int'l v. Velto*, 525 F.2d 432, 435 (9th Cir. 1975).

## ARGUMENT

## I.  THE DISTRICT COURT ERRED IN RULING THAT THE MINIMUM ROYALTY PAYMENTS WERE PATENT MISUSE

### A.  The Minimum Royalty Payments Were Not Patent Misuse

Had the district court correctly applied the Supreme Court's and this Court's precedents, it could have reached only one conclusion: the minimum payments here extracted no compensation for post-expiration use of the '135 patent and thus were

not patent misuse. This is the only possible legal conclusion based on the district court's own factual findings and the undisputed evidence about what occurred during the parties' settlement negotiations. And even if the district court's ultimate determination that the minimum payments compensated for post-expiration use of the '135 patent were deemed a factual finding (rather than a legal conclusion or mixed question reviewed de novo), that finding is clearly erroneous—especially under the correct legal standards.

### *1.* **Kimble** *expressly permits parties to defer compensation for pre-expiration use of a patent beyond the patent's expiration date without implicating patent misuse*

The Supreme Court in *Kimble v. Marvel Entertainment, LLC* made clear that the patent misuse defense invoked by Atrium is narrow—and purposefully so. 576 U.S. 446, 453-54 (2015). The Court acknowledged it had previously held in *Brulotte* that a patentee cannot use its patent leverage to extract royalties for sales of a product that "accrued after the last of the patents incorporated into the [product] had expired." *Brulotte v. Thys Co.*, 379 U.S. 29, 30 (1964). But recognizing that a "broad scholarly consensus" had since debunked the economics underlying that holding, *Kimble* emphasized that *Brulotte* does not prohibit parties from contracting for payments after a patent's expiration. *Kimble*, 576 U.S. at 453-54, 461. Rather, "all the decision bars are royalties for using an invention after it has moved into the public domain." *Id.* at 453-54. Thus, "[a] court need only ask whether a licensing

agreement provides royalties for post-expiration use of a patent." *Id.* at 459. If the answer is no, freedom of contract permits parties to structure their license agreements in a variety of diverse ways to serve the unique needs and mutual convenience of the parties. *Id.* at 453-54; *cf. Automatic Radio Mfg. Co. v. Hazeltine Res.*, 339 U.S. 827, 834 (1950) ("Sound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the licensing agreement.").

The *Kimble* Court itself highlighted several "ways around *Brulotte*" that permit parties to contract for payments after a patent's expiration without misusing the patent. 576 U.S. at 453. One of those ways is "to defer payments for pre-expiration use of a patent into the post-expiration period." *Id.* In other words, although payments are made after the patent expires, they compensate for conduct that occurred before expiration. Even *Brulotte* recognized the permissibility of such deferred compensation. 379 U.S. at 31 (distinguishing the royalties at issue, which were "by their terms" for post-expiration use, from "deferred payments for use during the pre-expiration period").

This "way[] around" *Brulotte* makes sense because, as the Supreme Court recognized, deferral can offer significant benefits to both parties. Spreading payments out over time often allows a lower rate, which "may bring the price the patent holder seeks within the range of a cash-strapped licensee." *Kimble*, 576 U.S.

at 453 ("Anyone who has bought a product on installment can relate."). It also allows parties to bargain to "better allocate the risks and rewards associated with commercializing inventions." *Id.* That ability to allocate risk is especially important where, as here, the negotiation involves future uncertainties, such as FDA approval.

Consistent with these principles, patent misuse does not occur simply because payments continue after a patent expires; rather, the touchstone of the inquiry is "whether a licensing agreement provides royalties for post-expiration *use* of a patent." *Id.* at 459 (emphasis added). The party asserting misuse must prove that those royalties actually compensate the patent owner for post-expiration use. *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1326 (Fed. Cir. 2010) (defendant bears the burden of proving patent misuse). Often, the text of the agreement itself provides this proof, such as when an agreement's terms expressly require per-use royalties on sales occurring after a patent expires. *Kimble v. Marvel Enters., Inc.*, 727 F.3d 856, 858-59 (9th Cir. 2013). But an agreement's mere silence or ambiguity fails to demonstrate patent misuse. *See Novo Industri A/S v. Travenol Lab'ys, Inc.*, 677 F.2d 1202, 1210 (7th Cir. 1982) (defendant "failed to carry its burden of proving [extraterritorial] patent misuse" where agreement was ambiguous and evidence was lacking); *cf. Walsh v. Schlecht*, 429 U.S. 401, 408 (1977) (ambiguous contracts should not be construed as unenforceable where a "logically acceptable" construction would render it enforceable). Nor does this Court look to expand patent

misuse to new kinds of arrangements, as it has stated that its "task is not to expand *Brulotte*'s holding beyond its terms." *Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1020 (9th Cir. 2007). "[E]xcept as required by *Brulotte* and its progeny," the Court "endeavor[s] to give effect to the intent of the parties and the bargain that they struck." *Id.*

### 2. The district court's findings and undisputed evidence demonstrate that the minimum royalty payments were deferred compensation

Applying that rule here, Atrium had to prove that the minimum royalty payments included compensation for Atrium's post-expiration iCast sales. It failed to do so. The district court's own findings and the undisputed facts establish three conclusions demonstrating the absence of patent misuse: (1) the License Agreement by its very terms excluded per-use royalties after the '135 patent expired, (2) the minimum payments included compensation for Atrium's pre-settlement infringement, and (3) the minimum payments included compensation for pre-expiration iCast sales but not post-expiration iCast sales.

### a. The License Agreement expressly dictated that the "per-use" royalties for U.S. sales of Licensed Products ended when the '135 patent expired

As the district court recognized, the License Agreement nowhere stated that the minimum payments compensate Bard for post-expiration use of the '135 patent. 1-ER-17. In fact, as a matter of contract interpretation, the opposite is true: under

the agreement's express terms, the only provision that provided compensation for ongoing U.S. sales of Licensed Products (Section 3.1) terminated that compensation when the '135 patent expired. 1-ER-17. And because the agreement expressly *precluded* ongoing "per-use" royalties after the '135 patent expired, nothing in the agreement suggested—let alone provided—that the minimum payments included royalties for use of an expired patent. 1-ER-17.

This legal conclusion flows from the text of the License Agreement. Under that agreement, the annual $15-million minimum payment comprised two parts: first, a 15% "per-use" royalty on ongoing sales of Licensed Products (governed by Section 3.1); and second, whatever amount was needed to make up the difference between those royalties and the $15-million minimum (governed by Section 3.2). The district court thus correctly noted that the $15-million payments initially included royalties for ongoing sales of Licensed Products in both the United States and Canada. 1-ER-17. But as the court recognized, that was only true as long as there were royalties for those sales under Section 3.1. 1-ER-17. Section 3.1 and Section 3.2 were independent because, even if Atrium sold no Licensed Products at all, it would still be required to make the minimum $15-million payment under Section 3.2. In that sense, even though Section 3.2 was titled "Minimum Royalties" (2-ER-137), the minimum payments were not actually royalties at all because they were not tied to sales. And it is what the payments compensate, not what they are

labeled, that matters for purposes of patent misuse.  *See Zila*, 502 F.3d at 1025 (directing courts to look at "what [plaintiff] is paying royalties for").[6]

As the district court correctly recognized, all royalties for U.S. sales under Section 3.1 ceased when the '135 patent expired.  1-ER-17.  That is because the definition of Licensed Products included only products sold "in a country where one or more claims of the Licensed Patents are issued and outstanding."  2-ER-135. Thus, products sold in the United States were included as Licensed Products only so long as the '135 patent—the only U.S. patent—remained "issued and outstanding." When the '135 patent expired, there was no longer any patent "outstanding" in the United States, so Atrium products sold in the United States were no longer Licensed Products subject to Section 3.1's royalty.  In contrast, because the Canadian Patent remains "outstanding" until 2024, products sold in Canada continue to be Licensed Products until that date.  As a result, Atrium must continue paying a 15% royalty on Canadian sales until 2024, and until then, those Canadian royalties continue to be included in its minimum payments.

---

[6] As discussed below (*infra* Sections I.A.2.b and I.A.2.c), the district court found based on extrinsic evidence that the minimum royalty payments in Section 3.2 compensated Bard for things other than ongoing sales of Licensed Products, including past infringement and iCast sales.  Of course, even if the district court had made no such findings, the License Agreement was silent as to what those minimum payments included and did not expressly contemplate post-expiration royalties for ongoing use of the '135 patent.

This structure demonstrates that whatever portion of the minimum payments was attributable to *ongoing* use of the '135 patent ended when that patent expired. Section 3.2's minimum payments should not be read to compensate for post-expiration sales when such payments were expressly excluded under Section 3.1. *Energy Partners, Ltd. v. Stone Energy Corp.*, No. 2402-N, 2006 WL 2947483, at *13 (Del. Ch. Oct. 11, 2006) ("The contract must also be read as a whole, so that the assessment of one section is consistent with the remainder of the contract.").[7] Indeed, Section 3.1's explicit exclusion of post-expiration royalties demonstrates that the parties understood and respected the prohibition against such royalties, which debunks any suggestion that Bard intended to exert improper patent leverage to expand its monopoly.

The terms of the License Agreement make it unlike other arrangements where this Court has found patent misuse. Unlike here, those agreements expressly provided for ongoing *use* royalties, and some also had other provisions that further suggested those ongoing payments were not deferred compensation. For instance, in *Kimble*, a settlement agreement provided for ongoing payment of "3% of 'net product sales'" with no expiration date. 727 F.3d at 858-59. In addition, because the agreement settled pending litigation, the patent owner received a lump sum

---

[7] The License and Settlement Agreements provided that Delaware law governs their interpretation. 2-ER-145; 2-ER-153.

payment of $516,214.62. *Id.* Similarly, in *Zila*, the agreement provided for "a five percent (5%) royalty on gross sales" as long as the company sold the products, and there was no dispute as to the purpose of this provision. 502 F.3d at 1016-17. No such provisions exist in the License Agreement here, as the agreement expressly terminated per-use royalties on U.S. sales of Licensed Products when the '135 patent expired. And while the agreement did provide for minimum payments after that date, the mere existence of payments post-dating a patent's expiration—without anything more—does not establish patent misuse under *Brulotte*.

> **b.** **Extrinsic evidence demonstrates that the minimum payments compensated for Atrium's past infringement and pre-expiration iCast sales**

Nor does extrinsic evidence suggest (much less establish) that the minimum payments compensated Bard for post-expiration use. The district court's findings based on the extrinsic evidence demonstrate that, instead of compensating for ongoing use of the '135 patent, the minimum payments compensated Bard for two things: (1) Atrium's past infringement that occurred before the settlement and (2) pre-expiration sales of iCast before its approval by the FDA for vascular use.

*Past infringement.* Everyone agreed that the minimum payments compensated for past infringement. 3-ER-265 ("Bard would wrap up the iCast royalties, royalties on Atrium's vascular products and royalties on Atrium's pre-

2010 sales, into what it called a Minimum Royalty."). And the district court correctly concluded as much, at least for payments until 2015. 1-ER-17.

It was undisputed at trial that a key purpose of the Agreements was to settle BPV's lawsuit against Atrium—a suit that exposed Atrium to substantial liability for past infringement. 2-ER-128; 1-ER-28. By 2011 when the Agreements were signed, Atrium had sold $320 million in infringing products (nearly $140 million in Vascular Products and $180 million in iCast). 5-ER-651, 5-ER-656; 5-ER-731. BPV had obtained a $519-million judgment against Gore for selling similar products. 2-ER-157; 5-ER-650. Thus, BPV's dismissal of the lawsuit and release of its infringement claims had significant value to Atrium, especially given Atrium's desire to be acquired by a larger company. 1-ER-28.

But other than Section 3.2's provision for minimum payments, nothing in the Agreements compensated Bard for Atrium's past infringement. Of course, no one believed that Bard granted Atrium a release for past infringement for free. Rather, as Atrium's witnesses conceded, that compensation for past infringement was folded into Section 3.2's minimum payments. As Atrium's Scofield testified, the minimum payments were "intended to cover," among other things, "sales of the iCast-covered stent which only had tracheal bronchial approval and did not have vascular." 3-ER-408; *see* 3-ER-317; 2-ER-82-84; 2-ER-116; 2-ER-191-95; 5-ER-672-75 ("Atrium clearly understood the linkage between the $15M annual minimum royalties, and

potential past liability. The minimums were in lieu of an up-front payment for alleged past infringement."). Thus, instead of a lump-sum payment reflecting "per-use" royalties for past sales, as Bard had initially requested (1-ER-10-11), the minimum payments spread out over time Atrium's payment for past damages (3-ER-339). As Bard showed and Atrium never disputed, that deferred compensation structure benefited Atrium because a sizable lump-sum payment for infringement would have deterred potential buyers, hindering Atrium's attempts to be acquired. 3-ER-339-40; 2-ER-83; *see Kimble*, 576 U.S. at 453-54 (recognizing the value to licensees of deferred compensation structures). It allowed Atrium "to minimize impact to the business and cost to the business," while still "meet[ing] the requirements that Bard wanted" for Atrium's past infringement. 2-ER-83.

Although the district court correctly concluded that the minimum payments included compensation for Atrium's past infringement, it erred when it determined that those payments stopped compensating Bard for past infringement in 2015. 1-ER-17. The sum total of the district court's analysis boils down to a single sentence: "The minimum royalties also covered allegedly infringing sales that occurred before the Lawsuit, but that portion was fully paid by 2015, when the Settlement Agreement provided that the release of Atrium for those past sales would be complete." 1-ER-17.

That bald conclusion cannot withstand scrutiny, as this Court owes no deference to the district court's contract interpretation or to unmade factual findings. *OneBeacon Ins.*, 634 F.3d at 1096. Based on the contracts themselves, nothing in the text of the Settlement or License Agreements linked the release to full compensation for past infringement in the way the district court suggests. To the contrary, the Settlement Agreement expressly provided that release was "conditioned upon compliance by Atrium with *all* of the provisions of the License Agreement." 2-ER-151 (emphasis added). Thus, there was no cutoff date after which the minimum payments stopped compensating for past infringement.

Although the Settlement Agreement allowed the release to become "unconditional and irrevocable" after January 1, 2015 (2-ER-151-52), that was not because liability for past infringement would have been fully paid by that date, but because the parties needed to reach a compromise on revocability. This is shown by undisputed record evidence of contemporaneous emails between the parties. Atrium wanted an irrevocable release from past liability in 2012, after two years of minimum payments. 5-ER-672-75; 5-ER-668. But Bard refused and communicated "that the release and the license are a package deal." 5-ER-672-75; *see* 5-ER-734-37 ("[I]t was not Charlie's impression or recollection that the $30 million was specifically tied to the release of the past infringement claims. Our understanding is that the release and the license were a package deal, and our expectation is that the license,

as a whole, is compensation for the release, and not just a portion (or limited term) of the license."); 5-ER-676-79 ("I do not dispute what your clients understood regarding the past liability, but Bard just did not have the same understanding."). Because the parties could not agree, they compromised by making the release irrevocable in 2015. 5-ER-672-75. That compromise did not mean either party believed that past liability would be paid in full after four years. It was just an in-between position that both parties could accept. There thus is no basis for the district court's conclusion—whether viewed as a matter of contract interpretation or clearly erroneous fact—that the release changed the character of the minimum payments after 2015.[8]

*Pre-expiration iCast sales.* In addition to past infringement, the district court found that the minimum payments also compensated Bard for Atrium's iCast sales, until and unless iCast was approved by the FDA for vascular use.

As the district court found, iCast was a critical part of the negotiations. 1-ER-15. It accounted for nearly 90% of Atrium's U.S. sales of ePFTE products, and Bard made clear that it would not accept a deal without compensation for iCast. 1-ER-5, 1-ER-15. Witnesses for both sides agreed that the minimum payments compensated

---

[8] In any event, the district court's erroneous conclusion fails to support its patent misuse determination. Even if the minimum royalty payments stopped compensating Bard for past infringement after 2015, that is not evidence that those payments compensated Bard for use of an expired patent.

for these iCast sales. 3-ER-317-18; 3-ER-408 (Scofield testifying that the minimum payments were "intended to cover" "sales of the iCast-covered stent which only had tracheal bronchial approval and did not have vascular"); 4-ER-535. And the district court correctly found that "Bard accepted the minimum as a means of compensating it for Atrium's use of the 135 Patent in the iCast products." 1-ER-16.

Critically, the minimum payments covered only iCast sales made during the '135 patent's lifetime. The district court should have reached that conclusion based on its own findings and the undisputed evidence concerning the parties' settlement negotiations. As Krauss testified and the district court correctly found, Bard wanted a "per-use" royalty modeled after the *Gore* judgment, *i.e.,* a lump sum of royalties due for past infringement and a "per-use" royalty going forward. 1-ER-13; 3-ER-476. The "per-use" royalty that Bard proposed expressly provided that all royalties on both Vascular Products and iCast would end in 2019 when the '135 patent expired. 1-ER-10-11; 5-ER-659. Had Atrium accepted Bard's proposal, no one disputes there would have been no patent misuse. And the same is true of all offers made or contemplated by either side before Atrium changed its mind and refused to pay per-use iCast royalties. 1-ER-10-11.

As the district court correctly found, the reason the parties "pivoted away" from this "per-use" royalty structure was Atrium's "concerns that this form of royalty could jeopardize FDA approval of iCast for vascular uses." 1-ER-16. To

address this concern, the parties adopted the minimum payment structure as a compromise—to compensate Bard for some of what it would have gotten under the *Gore* model while accommodating Atrium's refusal to tie royalties explicitly to iCast when it lacked FDA approval for vascular use. 1-ER-13-14, 1-ER-16. Although Bard preferred the *Gore* model, the district court found that it accepted this compromise to avoid litigation that could have jeopardized Bard's larger judgment in the *Gore* case. 1-ER-13, 1-ER-16. The court correctly found that the minimum payments were intended to be "a proxy for some type of rough valuation" or "gross approximation of what [Bard] wanted . . . , which was the Gore model." 1-ER-13-14, 1-ER-16 (omission in original).

The only reasonable conclusion to be drawn from these findings is that the minimum payments compensated Bard only for pre-expiration iCast sales. Under the parties' compromise, Bard gave up what it had proposed under the *Gore* model: direct royalties for all past infringement before the settlement and for iCast sales through the '135 patent's expiration. And it accepted the minimum payments as a replacement. Because it was impossible to know what future iCast sales would be, the minimum payments were meant to be merely a "gross approximation" or "proxy" for what Bard would have obtained under the *Gore* model. 1-ER-14; 3-ER-359 (Atrium witness testifying that the minimum payments "covered sort of a compendium of all of the things that we had done and it seemed—at least Bard was

presenting the case that it was easier to look at a one-size-fits-all strategy for our products"); 3-ER-476-77. If the *Gore* model did not seek iCast royalties for use of the '135 patent after its expiration, the minimum payments that replaced it could not have either. The only change was one of form due to Atrium's objection to paying direct "per-use" royalties on iCast. As a matter of law, simply changing how and when pre-expiration royalties are paid does not turn an otherwise permissible agreement into patent misuse. *Kimble*, 576 U.S. at 453-54.

What the parties expected to happen further supports this conclusion. Under the License Agreement, if Atrium obtained FDA approval for vascular use of iCast, minimum payments would cease. Atrium instead would pay a 15% "per-use" royalty on iCast as a Licensed Product until the '135 patent expired—*i.e.,* the arrangement would shift to the *Gore* model going forward. 2-ER-137. As the district court recognized, this is what the parties expected would happen: Atrium told Bard it expected to receive approval within one or two years. 1-ER-8. And Atrium expected that, after FDA approval, the 15% royalty on iCast would exceed $15 million per year. 2-ER-95-96; 2-ER-123. There is no dispute that, if Atrium's representation had come true, royalties on iCast would have ended in 2019, and there would have been no patent misuse.

Of course, if Atrium did not obtain FDA approval quickly, it would continue to pay the $15-million minimum under Section 3.2 until it received approval or until

the License Agreement ended in 2024, whichever came first. This protected Bard against the possibility that Atrium's prediction was overly optimistic (as it turned out to be) or that Atrium might delay the approval process. Although the minimum payments would last longer in that event, Atrium's own witnesses testified that the $15-million minimum was less than what Atrium expected to pay in annual royalties on iCast sales if it received FDA approval. 2-ER-123. Bard's expert confirmed this, calculating that Atrium would have paid $225 million had it gotten FDA approval by 2013 as expected and paid per-use iCast royalties until the '135 patent expired. 5-ER-680-81; 5-ER-654. As Krauss explained, by spreading payments out over a longer period of time, the minimum payment structure hedged against the risk that Atrium might not obtain timely FDA approval, allowing Bard to capture at least some of the lost pre-expiration iCast royalties. 3-ER-476 ("We didn't want to bet on whether the FDA would or would not approve their product and so we even made movement on this concept of the minimum payment.").

Comparing these two scenarios is telling. Even if Atrium never obtained FDA approval and the minimum payments continued until 2024, those payments would have amounted to $195 million ($15 million times 13 years). That amount is significantly less than the $225 million Atrium would have paid for pre-expiration use of the patents assuming iCast received FDA approval by 2013 (5-ER-680-81; 5-ER-654)—which belies any suggestion that Bard was using the minimum payments

to extract royalties for post-expiration use.  If that were the case, Bard should have received more, not less, than what the parties expected pre-expiration royalties to be.

The same logic applies when comparing the minimum payments to what Bard would have received under a "per-use" *Gore* model through expiration of the '135 patent.  For example, Bard's expert calculated that, if Atrium had paid a 15% "per-use" royalty on all sales (including iCast) until the U.S. patent expired, Atrium would have paid Bard $254 million.  5-ER-653-54; 5-ER-731-32.  The fact that Bard would receive tens of millions of dollars less in minimum payments than it would have received under a "per-use" royalty—which (as no one disputes) would not have constituted patent misuse—further refutes Atrium's claim that the minimum royalty payments somehow expanded Bard's patent monopoly.

In sum, based on the district court's own findings and the undisputed evidence about the parties' settlement negotiations, the only reasonable conclusion was that post-expiration minimum payments compensated for past infringement and pre-expiration iCast sales.  That was what Bard had sought under the *Gore* model and what it gave up in accepting the minimum payments as a compromise, so that is what the minimum payments represented—and nothing more.

### 3. The district court's legal errors led it to wrongly determine that the post-expiration minimum payments constituted patent misuse

Despite the absence of any term in the License Agreement providing that the minimum royalty payments compensated Bard for post-expiration use of the '135 patent and the district court's own findings showing that those minimum payments included deferred compensation, the district court ruled for Atrium on patent misuse based on several legal errors.

### a. The district court improperly required Bard to disprove patent misuse

Contrary to *Kimble* and *Zila*, the district court required Bard to prove a negative. It took an agreement that was (at worst) silent as to what the minimum royalty patents covered, and it required Bard to prove that post-expiration iCast sales were excluded from those payments. This was legal error. In the absence of some affirmative proof that post-expiration payments compensated a patentee for post-expiration use, a patent misuse claim must be rejected.

Here, the License Agreement nowhere stated that the minimum payments were intended to compensate Bard for post-expiration use; if anything, the agreement showed the opposite by *excluding* the agreement's per-use royalties once the '135 patent expired. 2-ER-137; *see supra* pp. 30-34. And Atrium can identify no extrinsic evidence—contemporaneous to the License Agreement or otherwise—that shows the Agreements' drafters intended to compensate Bard for the

'135 patent's use after its expiration. At most, Atrium pointed to the existence of minimum royalty payments after the '135 patent expired. 1-ER-16. But under *Kimble*, the mere fact that payments extend after a patent expires (without more) fails to prove patent misuse, particularly when the minimum payments continue only until the last patent in the package expires. *Kimble*, 576 U.S. at 454 ("Under *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires.").

Given the terms of the License Agreement, its own findings, and the record here, the district court's backwards reasoning was dispositive. The district court cited no evidence showing an agreement to include post-expiration use royalties. Nor did it point to any contractual provision stating that the minimum payments included post-expiration use. The court instead relied on the *absence* of evidence to the contrary. For example, the court relied on the fact that the parties did not "discuss or agree that the minimum royalties reflected only iCast sales between 2011 and 2019, or that payments of the minimum after 2019 would somehow represent only iCast sales before 2019." 1-ER-16; *see* 1-ER-17 ("It was never discussed."); 1-ER-17 ("Nothing in the evidence suggests that this purpose changed when the 135 Patent expired on August 20, 2019. The License and Settlement Agreements are silent on that point and the parties never discussed it."). These statements show that the district court required Bard to prove that there was an explicit agreement that

minimum payments compensated only for iCast sales before 2019.  The correct inquiry should have been whether *Atrium* had proven an agreement to extend royalties *beyond* 2019.  Given Atrium's dearth of evidence, the answer to that inquiry had to be no.

Atrium may argue (as it did in closing before the district court) that the mere continuation of *any* payments after a patent expires required Bard to come forward with affirmative evidence that the payments were deferred compensation.  4-ER-632-34.  That argument may be what led to the district court's error.  But Atrium's argument is at odds with *Kimble*'s instruction that many forms of post-expiration payments are permissible, and only one is not—royalties for post-expiration use. 576 U.S. at 454.  There is thus no basis for assuming that any post-expiration payment is necessarily tied to an expired patent's ongoing use.

The district court's error is all the more apparent because Atrium had the burden of proof—and that burden should have been by clear and convincing evidence.  As discussed, Atrium introduced no evidence that the minimum payments were for post-expiration use, so as a matter of law it failed to prove patent misuse, regardless of what standard of proof applies.  But as the district court recognized, some district courts have required proof by clear and convincing evidence, rather than a preponderance.  1-ER-18.  To the extent the decision here could turn on which

standard applies, the Court should adopt the rule, followed by numerous courts, that patent misuse must be proven by clear and convincing evidence.[9]

As those courts have explained, patents are "presumed valid and enforceable," and patent infringement claims are presumed to be brought in good faith, so clear and convincing evidence is required to overcome these presumptions. *FatPipe Networks India Ltd. v. XRoads Networks, Inc.*, No. 9-cv-186, 2015 WL 12778762, at *28 (D. Utah Sept. 22, 2015); *Conceptual Eng'g Assocs., Inc. v. Aelectronic Bonding, Inc.*, 714 F. Supp. 1262, 1269 (D.R.I. 1989). Just as defenses like invalidity, bad faith, inequitable conduct, and unclean hands must satisfy this higher evidentiary standard for this reason, patent misuse is similar and should be subject to the same standard. *See, e.g., Fatpipe Networks*, 2015 WL 12778762, at *28; *Saint Lawrence Commc'ns v. Motorola Mobility LLC*, No. 15-cv-351, 2018 WL 915125, at *6 (E.D. Tex. Feb. 15, 2018); *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, No. 12-cv-329, 2014 WL 12587050, at *8 (C.D. Cal. Dec. 16, 2014); *cf. Novo*

---

[9] *See, e.g., Trading Techs., Int'l v. IBG LLC*, No. 10-cv-715, 2021 WL 25541, at *2 (N.D. Ill. Jan. 4, 2021); *Saint Lawrence Commc'ns*, 2018 WL 915125, at *5-6; *FatPipe Networks India Ltd. v. Xroads Networks, Inc.*, No. 9-cv-186, 2015 WL 12778762, at *28 (D. Utah Sept. 22, 2015); *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, No. 12-cv-329, 2014 WL 12587050, at *8 (C.D. Cal. Dec. 16, 2015); *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 900 F. Supp. 1386, 1404 (D. Colo. 1995), *aff'd in part and rev'd in part on other grounds*, 265 F.3d 1268 (Fed. Cir. 2001); *Ares Trading S.A. v. Dyax Corp.*, No. 19-02300, 2023 WL 2456437, at *21 (D. Del. Mar. 10, 2023).

*Nordisk A/S v. Caraco Pharm. Lab'ys., Ltd.*, 601 F.3d 1359, 1367 (Fed. Cir. 2010) (patent misuse defense must be examined "with particularity" because it "creates an unusual circumstance where an infringer can escape the consequences of its infringing conduct"), *rev'd on other grounds*, *Caraco Pharm. Lab'ys., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399 (2012).[10] In any event, regardless of whether or how this Court resolves the standard of proof question, it should reverse because Atrium has not met its burden under even the lesser preponderance standard.

### b. The district court also erred by requiring Bard to produce a particular kind of evidence

The district court further erred by requiring a particular kind of evidence to disprove patent misuse. That too was legal error, as *Kimble* imposes no such restrictions.

First, the district court fixated on the lack of express discussion or statements during negotiations about the minimum payments being deferred compensation. 1-ER-16-17. But no authority suggests that explicit contemporaneous statements are

---

[10] Although Atrium cited below a handful of cases in which the district court applied a preponderance standard, none of those courts provided any reasons for doing so. *See Bradley Corp. v. Lawler Mfg. Co., Inc.*, No. 19-cv-1240, 2020 WL 7027875, at *5 (S.D. Ind. Nov. 30, 2020); *Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1118 (N.D. Ill. 2015); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 4-cv-5312, 2008 U.S. Dist. LEXIS 4627, at *8 (N.D. Ill. Jan. 18, 2008); *GFI, Inc. v. Franklin Corp.*, 88 F. Supp. 2d 619, 621 (N.D. Miss. 2000), *aff'd*, 265 F.3d 1268 (Fed. Cir. 2001); *Transitron Elec. Corp. v. Hughes Aircraft Co.*, 487 F. Supp. 885, 908 (D. Mass. 1980).

required. To the contrary, what contracting parties intended can be proven many ways. The parties' offers and the course of negotiations can be compelling evidence of intent when the text of the agreement is ambiguous. *See, e.g., Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) (extrinsic evidence can include not just "overt statements and acts of the parties" but also "the business context" and "prior dealings between the parties" (citation omitted)); *Am. Fed. of Musicians of U.S. & Can. v. Paramount Pictures Co.*, 903 F.3d 968, 977 (9th Cir. 2018) (extrinsic evidence includes "the parties' bargaining history" (citation omitted)). Here, Bard's initial proposal under the *Gore* model and its subsequent compromise are persuasive evidence that Bard only sought compensation for iCast sales until 2019. But the court ignored that evidence—not because it found the evidence unpersuasive but because it erroneously fixated on explicit contemporaneous statements (or the lack of such statements).

Second, the district court faulted Bard for the absence of any pre-settlement calculation equating the total value of minimum payments with the amount of royalties that would have been paid on iCast sales before the '135 patent expired in 2019. *See* 1-ER-16 ("The parties never calculated the approximate value of per-use iCast royalties between 2011 and 2019, and they never apportioned that approximation over the period from 2011 to 2024."); 1-ER-16-17 (similar). Of course, that kind of exact calculation and amortization would have been one way to

establish a deferred payment structure, but it is far from the only way. Here, such a calculation would have been impossible. At the time of the negotiations, no one knew what future iCast sales would be, so it was undisputed that the parties could not calculate exactly how much Atrium would have paid on iCast through the '135 patent's expiration. 1-ER-14. The minimum payments were therefore not intended to mathematically equal that unknown amount and were instead a gross approximation of many things wrapped into one flat payment so the parties could arrive at an agreement. 3-ER-339. Nothing in *Kimble* or this Court's precedents prevents such compromises, which are often essential for settlement. *See Hazeltine*, 339 U.S. at 834 ("Sound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the licensing agreement.").

\*    \*    \*

In sum, the district court failed to arrive at the only reasonable legal conclusion from its own findings of fact because it misapplied the Supreme Court's instruction in *Kimble* and this Court's instruction in *Zila*. Instead of requiring Atrium to prove that the payments were compensation for post-expiration use of the '135 patent, it required Bard to prove that they were not. That error led it to expand *Brulotte* to a new category of license agreements—ones that provide not for royalties for ongoing use of the patent, but for flat payments that compensate a "compendium"

of many things. That expansion flies in the face of this Court's instruction "not to expand *Brulotte*'s holding beyond its terms." *Zila*, 502 F.3d at 1020.

**B.    In The Alternative, The Minimum Royalty Payments Were Not Patent Misuse Because The Canadian Patent Has Not Expired**

Alternatively, the minimum payments are not patent misuse for an independent reason: the License Agreement covered not just the '135 patent but also the Canadian patent, which has not expired. *Kimble* and *Brulotte* permit royalty payments to continue until the Canadian patent expires in 2024, regardless of whether the payments are considered deferred compensation. Bard pressed this point (5-ER-687-88, 5-ER-689-90), but the district court never addressed it.

*Kimble* expressly instructed that "[u]nder *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires." *Kimble*, 576 U.S. at 454. Thus, parties can license a "bundle" or "package" of multiple patents that expire at different times and require royalties on the package to continue until the last patent expires. *Zila*, 502 F.3d at 1025-26; *GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1236 (S.D.N.Y. 1981) ("The Supreme Court has expressly approved the payment of royalties on all patents in a license package until the expiration of the last patent in the package."); *see Automatic Radio Mfg.*, 339 U.S.

at 834.  Following this rule, multiple courts have found no patent misuse and enforced royalties where some, but not all, of the patents in a package had expired.[11]

The language of the License Agreement here mirrors the circumstances approved in *Kimble*.  The Agreement granted Atrium a license to a package of patents: the '135 patent and the Canadian patent.  Atrium must make minimum royalty payments "until the last to expire of all of the patents included within the Licensed Patents."  2-ER-142.  While the '135 patent has expired, the Canadian patent has not.  Atrium continues to sell products in Canada and therefore—as the district court correctly recognized—continues to owe a 15% royalty on those sales under Section 3.1 until the Canadian Patent expires in 2024.  1-ER-17 n.9.

If those Canadian royalties exceed the minimum threshold of $15 million per year, the Agreement requires Atrium to pay that amount under Section 3.1.  If they do not, the Agreement requires Atrium to pay the $15-million minimum under Section 3.2.  As discussed above, this provision set a floor for payments, because the

---

[11]    *See, e.g., McCullough Tool Co. v. Well Surveys, Inc.*, 343 F.2d 381, 408-10 (10th Cir. 1965); *Hearing Components, Inc. v. Shure, Inc.*, No. 7-cv-104, 2009 WL 815526, at *9 & n.8 (E.D. Tex. Mar. 26, 2009); *GAF*, 519 F. Supp. at 1236; *Nautilus, Inc. v. ICON Health & Fitness, Inc.*, 304 F. Supp. 3d 552, 566-68 (W.D. Tex. 2018); *Ares Trading*, 2023 WL 2456437, at *24; *Sunrise Med. HHG, Inc. v. AirSep Corp.*, 95 F. Supp. 2d at 458-59; *Alvarado Orthopedic Rsch., LP v. Linvatec Corp.*, No. 11-cv-246, 2013 WL 2351814, at *7 (S.D. Cal. May 24, 2013); *Cardinal of Adrian, Inc. v. Keystone Consol. Indus., Inc.*, No. 76-cv-70866, 1977 WL 22705, at *1 (E.D. Mich. Mar. 11, 1977); *cf. TSI Techs. LLC v. CFS Brands, LLC*, No. 23-cv-1011, 2023 WL 6294259, at *3 (D. Kan. Sept. 27, 2023).

parties could not know what future royalties on U.S. and Canadian sales would turn out to be. 3-ER-478 ("Q. So was there any way to know how much they were actually going to sell for the years after this? A. No. . . . We had no idea."); [187, 231]. That Atrium's actual Canadian sales may not generate royalties exceeding the minimum threshold does not somehow retroactively turn the parties' agreement into patent misuse. The same was true of U.S. sales of Licensed Products, which (because of the delay in iCast's FDA approval) likewise never generated royalties exceeding the minimum threshold before the '135 patent expired. 5-ER-731.

Although Atrium argued in district court that there must be a "discount" in the royalty rate after each patent in a package expires, this Court has required a discount only for a "so-called 'hybrid' licensing agreement encompassing inseparable patent and non-patent rights." *Kimble*, 727 F.3d at 857. The concern in hybrid agreements is that the patent owner has used patent leverage when negotiating for non-patent rights, so a discount alleviates that concern. *Id*. at 864-65. That is not the circumstance here, where only patent rights are involved. *See, e.g., Well Surveys, Inc. v. Perfo-Log, Inc.*, 396 F.2d 15, 17-18 (10th Cir. 1968); *Hearing Components*, 2009 WL 815526, at *9; *Sunrise Med.*, 95 F. Supp. 2d at 458-59; *Cardinal of Adrian*, 1977 WL 22705, at *1.

Accordingly, under *Kimble*, there is no patent misuse in requiring the minimum payment under Section 3.2 to continue until the Canadian patent expires. That is yet another reason to reverse.

## II. THE DISTRICT COURT ERRED IN RULING THAT BARD CANNOT RECOVER ON AN ALTERNATIVE CLAIM OF QUANTUM MERUIT

At the very least, if the Court declines to enforce the parties' Agreement, it should vacate and remand for the district court to reconsider Bard's quantum meruit claim, including whether the royalties Atrium has paid to date are less than the fair value of the release and license Atrium received.

### A. This Court Should At Least Remand For Bard To Press Its Quantum Meruit Claim For The Fair Value Of The Release And License Granted To Atrium

Quantum meruit is a quasi-contract theory that permits recovery for services performed "where recovery under contract is not available," such as where the contract is unenforceable. *Nepa v. Marta*, 415 A.2d 470, 472 (Del. 1980); *Stoltz Realty Co. v. Paul*, No. 94C-02-208, 1995 WL 654152, at *10 (Del. Super. Sept. 20, 1995). To recover, a plaintiff must demonstrate that "(i) [it] performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid." *Petrosky v. Peterson*, 859

A.2d 77, 79 (Del. 2004).  If it does so, quantum meruit permits recovery, not of the contract price, but of the "reasonable value of his or her services." *Id.*[12]

This Court has suggested that quantum meruit recovery is available when part of a license agreement is void for patent misuse. *Kimble*, 727 F.3d at 867 n.8.  In such cases, the patentee "is essentially asking to be placed in the position that he would have occupied had the Settlement Agreement never been made." *Id.* Quantum meruit can thus allow recovery "if the amount of royalties paid was lower than the fair market value of the defendant's use of the license." *Id.*; *Scheiber v. Dolby Lab'ys, Inc.*, 293 F.3d 1014, 1023 (7th Cir. 2002).

Accordingly, if the Court here holds the License Agreement's minimum payments unenforceable after 2019 due to patent misuse, Bard is entitled to bring a quantum meruit claim.  As discussed above (*supra* at 35), Bard and BPV conferred significant value on Atrium by granting it a release for past infringement and a license to sell its products until 2019 without fear of another lawsuit. *See also* 1-ER-28-29 (district court recognizing same at summary judgment).  Bard plainly expected to be paid for this release and license, and Atrium was aware of that expectation.  That expectation is evidenced in the parties' negotiations and the Settlement and License Agreements.  If the Agreements' minimum payments are not

---

[12] The parties below both addressed quantum meruit under Delaware law.  2-ER-48-50; 5-ER-691-92.

enforced, Bard has been deprived of the full benefit of its bargain and is entitled to seek restoration of "the position that [it] would have occupied had the Settlement Agreement never been made." *Kimble*, 727 F.3d at 867 n.8. Restoring Bard to that position requires payment of the difference between "the fair market value" of the license and release Bard conveyed to Atrium and the amount that Atrium has paid Bard thus far. *Id.*

That difference is substantial. Although Atrium has paid roughly $130 million in royalties to date (5-ER-648), Bard's expert opined that the value of the release and license Atrium received were significantly greater than that amount. For example, using Atrium's projected sales at the time of settlement, the expert concluded Atrium would have been exposed to damages of up to $281 million if it had not settled. 5-ER-653-54. That calculation was conservative because it did not include lost profits and enhanced damages, which were awarded against Gore. An alternative calculation using Atrium's actual sales places the value of the release and license at around $254 million. 5-ER-653-54; 5-ER-731.

## B. The District Court Legally Erred In Rejecting Bard's Quantum Meruit Claim

The court did not decide how much benefit of the bargain Bard had lost because it held that quantum meruit was unavailable. In so concluding, the district legally erred in two ways.

### 1.   The district court erroneously conflated *quantum meruit* with *promissory estoppel*

In rejecting Bard's *quantum meruit* claim, the district court never analyzed the legally relevant questions: whether Bard had granted a release and license to Atrium without expectation of being paid or whether Atrium had no reason to know Bard expected to be paid. *See* 1-ER-18-20. Instead, the court grouped Bard's *quantum meruit* claim together with its *promissory estoppel* claim and rejected them both in the same sentence. It held Bard could not recover under either theory because "the parties never discussed or agreed that compensation for past damages and sales of iCast products between 2011 and 2019 would be deferred to payments made after 2019." 1-ER-18.

Even if true, that statement is irrelevant to *quantum meruit*. It addresses only *promissory estoppel* and ignores the important distinctions between the two theories. While *promissory estoppel* seeks to enforce a promise made by the defendant, *quantum meruit* treats any agreement between the parties as rescinded and awards instead the fair value of any services rendered. *Compare Windsor I, LLC v. CWCapital Asset Mgmt LLC*, 238 A.3d 863, 876 (Del. 2020) (promissory estoppel requires, *inter alia*, that "a promise was made" and "is binding because injustice can be avoided only by enforcement of the promise"); *with Kimble*, 727 F.3d at 867 n.8 (quantum meruit restores the patentee to "the position [it] would have occupied had the Settlement Agreement never been made"); *Petrosky*, 859 A.2d at 79. Thus,

whereas a lack of agreement about deferring compensation may affect whether a promise was made for purposes of promissory estoppel, it does not affect the fair value of what Atrium received. Indeed, quantum meruit is available even when there was no express agreement at all. *Stolt*, 1995 WL 654152, at *10.

By conflating these two distinct theories, the district court failed to meaningfully address Bard's quantum meruit claim, instead rejecting it for a legally erroneous reason. And as explained above, when considered under the proper legal standards, the requirements for quantum meruit are satisfied here.

### 2. *The district court also erred in holding that quantum meruit is not available in cases involving patent misuse*

The district court further erred by holding that patent misuse barred quantum meruit recovery. 1-ER-19-20. This conclusion is wrong as a matter of law.

*First*, it contradicts this Court's instruction in *Kimble*. As this Court and the Seventh Circuit have both recognized, quantum meruit can apply even in cases of patent misuse as long as "the amount of royalties paid was lower than the fair market value of the defendant's use of the license." *Kimble*, 727 F.3d at 867 n.8; *Scheiber*, 293 F.3d at 1023. Indeed, this Court expressly rejected the view adopted by the district court here: "Like the Seventh Circuit, we do not read *Brulotte* to preclude such a claim." *Kimble*, 727 F.3d at 867 n.8. The district court ignored that instruction and did not even mention it.

*Second*, the district court's reasoning is flawed even on its own terms. The court compared patent misuse to unclean hands and reasoned that granting Bard equitable relief would frustrate the public policy behind the patent misuse doctrine. 1-ER-18-19. It stated: "Because the License Agreement's requirement of minimum royalties for iCast sales after the 135 Patent expired is patent misuse, the Court will deny Bard's request for equitable relief that would accomplish the same thing." 1-ER-19. Notably, the court's discussion again lumps together all equitable relief without distinguishing quantum meruit from promissory estoppel.

That distinction is important because, unlike promissory estoppel, quantum meruit does *not* "accomplish the same thing" as enforcing the alleged patent misuse. Promissory estoppel enforces a defendant's promise and thus can permit a plaintiff to recover its "expectation interest" as if the promise had been performed. *Grunstein v. Silva*, No. 3932-VCN, 2011 WL 378782, at *11 (Del. Ch. Jan. 31, 2011). That could arguably "accomplish the same thing" as enforcing the unenforceable contract. By contrast, quantum meruit does not permit a plaintiff to recover its expectation interest or the bargained-for price. It permits recovery only of "the reasonable worth or value of services rendered," as determined by the court. *Marta v. Nepa*, 385 A.2d 727, 730 (Del. 1978). By its very terms, that "reasonable worth" necessarily excludes any royalties *after* a patent expires. As such, quantum meruit does not

"accomplish the same thing" as enforcing the contract, but instead merely prevents a defendant from receiving the benefits of the now-unenforceable contract for free.

Even the decisions relied on by the district court illustrate its error. It cited two cases from the District of Delaware that have nothing to do with patent misuse at all. 1-ER-19-20 (citing *Columbus Life Ins. Co. v. Wilmington Tr.*, No. 20-cv-736, 2021 WL 1820614 (D. Del. May 6, 2021); *Wilmington Sav. Fund Soc'y, FSB v. PHL Variable Ins. Co.*, No. 13-cv-499, 2014 WL 1389974 (D. Del. Apr. 9, 2014)). Those decisions held that promissory estoppel could not be used to enforce an insurance company's promise to pay the proceeds of a void life insurance policy because doing so would essentially amount to enforcing the void policy. *Columbus Life Ins.*, 2021 WL 1820614, at *5-7; *Wilmington Sav. Fund*, 2014 WL 1389974, at *12. Neither court, however, applied to same reasoning to quantum meruit. To the contrary, one court held that, while the policyholder could not recover the policy's proceeds, he may nonetheless be able to recover premiums paid on the policy to prevent the insurer's unjust enrichment. *Columbus Life Ins.*, 2021 WL 1820614, at *8-9.

That is consistent with the recognition that enforcing a void contract and returning the parties to their original position had the contract never been made are two different—indeed, opposite—principles. Even if the former is prohibited by public policy, the latter need not be. Thus, neither this Court nor the Seventh Circuit expressed any concern that quantum meruit would somehow undermine the public

policy against patent misuse. *See Kimble*, 727 F.3d at 867 n.8; *Scheiber*, 293 F.3d at 1023. The district court's holding to that effect was further legal error.

For these reasons, at the very least, this Court should remand for the district court to consider whether the royalties Atrium has paid were lower than the fair value of the release and license it received.

## CONCLUSION

The Court should reverse and hold that the minimum royalty payments were not patent misuse. Alternatively, the Court should vacate and remand for the district court to reconsider Bard's quantum meruit claim.

Dated: November 29, 2023                Respectfully submitted,

MATTHEW A. TRAUPMAN                      s/ Brian R. Matsui
QUINN EMANUEL URQUHART &                 DEANNE E. MAYNARD
SULLIVAN, LLP                            BRIAN R. MATSUI
51 Madison Avenue                        SETH W. LLOYD
New York, NY 10010                       DIANA L. KIM
                                         MORRISON & FOERSTER LLP
STEVEN C. CHERNY                         2100 L Street NW, Suite 900
QUINN EMANUEL URQUHART &                 Washington, DC 20037
SULLIVAN, LLP                            Tel: (202) 887-8784
111 Huntington Avenue, Suite 520         BMatsui@mofo.com
Boston, MA 021996

*Counsel for C. R. Bard, Inc.*

## STATEMENT OF RELATED CASES

The undersigned attorney states the following: I am unaware of any related cases currently pending in this court.

Dated:  November 29, 2023

                                                    s/ Brian R. Matsui
                                                       Brian R. Matsui

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-16020, 23-16051

I am the attorney or self-represented party.

**This brief contains** | 13,994 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

◉ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Brian R. Matsui | **Date** | Nov. 29, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 23-16020, 23-16051

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Opening Brief provisionally filed under seal

**Signature** | s/ Brian R. Matsui | **Date** | Nov. 29, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*